## Case No. 12,642.

SELIGMAN v. CHARLOTTESVILLE NAT. BANK.

[3 Hughes. 647; 25 Int. Rev. Rec. 385; 9 Reporter, 72; 2 Nat. Bank Cas. (Browne) 195; 1 Wkly. Jur. 584; 21 Alb. Law J. 196.] [1]

Circuit Court, W. D. Virginia. Oct. Term, 1879.

BANKS—NATIONAL—GUARANTEE OF CREDIT.

1. A national bank, upon the deposit of collateral security with it, has no power to guarantee the obligation of the person making such deposit.

[Cited in brief in Ellerbe v. National Exch. Bank of Kansas City, 109 Mo. 445, 19 S. W. 241.]

2. A national bank may lend money on personal security, but not on its credit.

In covenant.

W. J. Robertson and R. G. H. Kean, for plaintiffs.

1. The true construction of the transaction, upon the face of the papers set out in the declaration, is that the proceeds of the letter of credit were to go into the hands of the bank, and were to be used when so realized in discounting from time to time, as realized, so much of the "good business paper" hypothecated by the Flanagans.

2. In this (the true) view of the transaction, the question resolves itself into the inquiry whether a national bank can borrow money?

3. It seems to be conceded (as it must be) that, under certain circumstances, a national bank can borrow money, e. g., to meet a pressing liability. If so, who is to judge of the emergency? [2] Obviously, the lender cannot; therefore the question of illegality can only arise between stockholders and officers.

4. If a national bank can borrow money for legitimate banking purposes this transaction will be sustained, being, in legal effect, a mere method of securing a loan, the proceeds of which were to be used in discounting "business paper."

5. The subsequent insolvency of the bank and of B. C. Flanagan & Son in no way affect the legal questions. The receiver stands where the bank would if it had not failed. Woods, J., in Casey v. La Société de Credit Mobilier [Case No. 2,496].

6. The later view, in England and the United States, frowns on the defense of ultra vires, as applied to executed contracts, even when the contract is such as, upon a nice construction, would be regarded as beyond the corporate objects. See cases cited in printed note in Slaughter v. City of Lynchburg; also, Riche v. Ashbury Railway Carriage & Iron Co., L. R. 9 Exch. 244 [L. R. 7 H. L. 653], article on "Ultra Vires." January 4, 1878; Houghton v. First Nat. Bank of Elkhorn, 26 Wis. 663; Bushnell v. Chautauqua County Nat. Bank, 10 Humph. 378, Thomp. Nat. Bank Cas. 794; Whitney Arms v. Barlow, 63 N. Y. 62; Bissell v. Michigan, S. & N. I. R. Co., 22 N. Y. (8 Smith) 258; and Parish v. Wheeler, Id. 494; First Nat. Bank of Charlotte v. National Exch. Bank, 92 U. S. 122, Thomp. Nat. Bank Cas. 124; Town of Coloma v. Eaves. 92 U. S. 484; Commissioners of Douglas County v. Bolles, 94 U. S. 104; cases cited in the foregoing.

7. When the act complained of has been executed and the creditor has parted with his money on the faith of what the corporation has promised, only a substantial adherence to the purpose of its creation is required to bind it, although the act might be one which, if executory, it might be restrained from engaging in. Coleridge, J., in Eastern Co. R. Co. v. Hawkes, 35 Eng. Law & Eq. 29; Comstock, C. J., in Bissell v. Michigan, S.

---

[1] [Reported by Hon. Robert W. Hughes. District Judge, and here reprinted by permission. 9 Reporter, 72, and 21 Alb. Law J. 196, contain only partial reports.]

[2] See National Bank of Commerce v. National Bank of Missouri, Append. Fed. Cas.; also, Swayne, J., in Merchants' Nat. Bank v. State Nat. Bank, 10 Wall [77 U. S.] 604. "If the contract can be valid under any circumstances, an innocent party in such a case has a right to presume their existence, and the corporation is estopped to deny them." Same case, Thomp. Nat. Bank Cas. 55, for above-quoted expression

& N. I. R. Co., 22 N. Y. [8 Smith] 258; and Parish v. Wheeler, Id. 494. As to executed contract, Bushnell v. Chautauqua Co. Nat. Bank, Thomp. Nat. Bank Cas. 796, 10 Humph. 378.

8. Nothing in the view that the nine per cent. guaranteed was illegal, because—First. The law specifically provides what the penalties of usury shall be. Second. It was never said that the forfeiture of interest should avoid the contract. Third. The bank is estopped to allege its usury practiced on Flanagan & Son as a reason for repudiating its agreement with plaintiffs, who are innocent of all usury. 9 Mass. 1.

9. To say that a temporary loan made to tide over a tight time, and protect customers, is an unlawful increase of the capital stock is to abuse language. The whole answer is, the thing is not true.

10. There was nothing wrong or vicious in what the plaintiffs did. Their bona fides is beyond question. This being so, to enable the bank to repudiate its engagement, on the faith of which the plaintiffs parted with their money, it must appear affirmatively that there was no natural and direct connection between the arrangement made and the purpose for which the charter was granted.

S. V. Southall and Duke & Duke, for defendants.

1. Corporations, created by statute, depend for their powers, and for the mode of exercising them, on the construction of the statute itself. Bank of U. S. v. Dandridge, 12 Wheat. [25 U. S.] 64; Head v. Providence Ins. Co., 2 Cranch [6 U. S.] 127; Fowler v. Scully, Thomp. Nat. Bank Cas. 855; Matthews v. Skinker, Id. 649.

2. A corporation can make no contract and do no act except such as are authorized by its charter, either expressly, or as incidental to its existence. First Nat. Bank of Lyons v. Ocean Nat. Bank, Thomp. Nat. Bank Cas. 737. "The express grant of the powers mentioned is, on familiar principles, an implied exclusion of all not mentioned." Wiley v. First Nat. Bank, Id. 908.

3. Section 8 of the national banking act (13 Stat. 101) defines and limits the powers of the banks, the powers not granted and not necessary to their existence being prohibited. Weckler v. First Nat. Bank of Hagerstown, Thomp. Nat. Bank Cas. 540–542. "Dealing in stocks is not expressly prohibited; but such a prohibition is implied from the failure to grant the power." First Nat. Bank of Charlotte v. National Exch. Bank, 92 U. S. 128, reported in Thomp. Nat. Bank Cas. 129.

4. Accommodation indorsement by banks unauthorized. Bank of Genesee v. Patchin Bank, 3 Kern. (13 N. Y.) 309; Farmers' & Mechanics' Bank v. Butchers' & Drovers' Bank, 16 N. Y. 128, 129; 26 Barb. 23, 568; 30 Barb. 421; 1 Daniel, N. Y. Notes, 290, 291; Green's Brice, Ultra Vires, 121, 122, note. Public policy requires that banks should not lend their credit, whether compensated for it or not; indeed, compensation but increases the evil. If they can guarantee for, or without a consideration, then they can guarantee railroad bonds, city bonds, private bonds, and all bonds, and their liability becomes illimitable.

5. Banks expressly prohibited from guaranteeing or borrowing. Nat. Bank Act, § 5202. Not only the shareholders and the depositors and the local public, but the United States government itself, and the people represented by it, are interested in maintaining the credit of the banks; hence the restrictions imposed upon them by congress. Farmers' & Mechanics' Nat. Bank v. Dearing, Thomp. Nat. Bank Cas. 117.

6. A person dealing with a corporation is presumed to know the extent of its corporative powers. Farmers' & Mechanics' Bank v. Butchers' & Drovers' Bank, 16 N. Y. 129, 130; [Pearce v. Madison & I. R. Co.] 21 How. [88 U. S.] 443; 42 Barb. 488; [Rogers v. Burlington] 3 Wall. [70 U. S. 669]. Hence Seligman knew that his transaction was illegal. The court may sympathize with Seligman's loss of his money, and rigidly enforce his remedy, if he has one, against the officers of the bank who exceeded their powers, but that is no reason why the money of either innocent depositors or stockholders should be taken to pay Seligman.

7. The Flanagan proposition to the bank, the resolution of the board of directors authorizing the guarantee, and the guarantee itself, as set forth in the declaration, import a simple guarantee by the bank upon the supposed protection of the $35,000 of business paper (so called) as collateral security. The bank could not "receive" (for purposes of discount) money arising under the Seligman contract, if said Seligman contract was "used" to a corresponding extent by the Flanagans themselves. But suppose it was understood all around that the money raised by the Flanagans on the Seligman contract should be turned over by them to the bank, provided it was returned to the Flanagans, as the proceeds of the discount of the business paper, were not the parties precisely where they would have been if the money so raised had remained in the Flanagans' hands, and the bank had been paid by them 2 per cent. for its guarantee? And if this could not be done directly, it could not be done indirectly.

8. Seligman's contract did not contemplate money being received by either the bank or Flanagan & Son, but only credit was to be gotten under it.

9. If the bank was to receive money on the Seligman contract, and discount Flanagan & Son's paper with it, in consideration of guarantee, then consideration failed, because Seligman furnished the money to Flanagan & Son (who used it), and not to the bank.

10. If the Seligman contract with the bank's guarantee is to be treated as a re-discount for the bank, then it was a re-discount by Seligman & Co. when they knew that the

$35,000 of business paper had not been previously discounted by the bank, and no bank can have paper re-discounted till by discount it becomes the owner of such paper. And the Flanagans, and not the bank, having received the avails of the arrangement, the bank is not bound legally or equitably. And if the Seligman contract with the guarantee is to be treated as Flanagan & Son's note indorsed by the bank, and if it was understood that Seligman should furnish Flanagan & Son the money on it, with the further understanding that Flanagan & Son should turn it over to the bank, to be returned to them by the bank as the proceeds of the discount of the business paper, then it simply amounted to a lending of the money by Seligman to Flanagan upon the bank's guarantee, which was protected by the business paper as collateral. And if this could not be done directly, it could not be done indirectly.

11. The bank had no power to borrow money to lend again.

12. Usurious lending by banks expressly prohibited. Seligman rests his case upon Flanagan's proposition, which was a usurious one, and, therefore, illegal, and, being illegal, cannot support Seligman's claim.

13. If a national bank has the power to borrow money, it certainly can be done only to meet an emergency, for instance, to raise money to meet a pressing debt, thus merely substituting one creditor for another. But no bank, least of all a national bank, can borrow money to lend a customer. To do this is indirectly to increase the capital stock of the bank, which the national banking act says cannot be done without the comptroller's consent. Besides, money borrowed by the bank upon the note of its customer, strengthened by its own indorsement, to be lent by it to its customer with the knowledge of the lender to the bank, amounts simply to a direct lending by the creditor to the bank's customer upon his note indorsed for his accommodation by the bank. It is merely an attempted evasion of the prohibition imposed upon the bank against indorsement for the benefit of a third party. See Leavitt v. Blatchford, 5 Barb. 9.

14. National banks may "make contracts," but only such contracts as the act contemplates, those belonging to legitimate banking business of the kind prescribed by the statute.

15. The guarantee in this case is so extraordinary, that the seal of the corporation is annexed to the paper.

16. It is true that the penalty imposed upon a national bank for committing usury does not extend to the principal of the debt. But it forfeits all the interest, so that the Flanagan proposition legally deprived the bank (if there was really to be anything more than a pretended discounting under it) of all the benefit which the plaintiffs say the bank was to get by it, thus leaving the transaction without the semblance of consideration, so far as the bank was concerned. And, besides, the penalty, though great or small, is imposed because an act forbidden has been done, and an act forbidden is illegal, and the Seligmans cannot rest their claim upon an act which they knew to be illegal, an act prohibited by law, and never sanctioned by the shareholders of the bank.

BOND, Circuit Judge. The declaration in this cause sets out that J. & W. Seligman & Co., of New York, are bankers; that on the 14th day of May, 1875, B. C. Flanagan & Son made a proposition to the Charlottesville National Bank, in writing, to this effect: "In consideration of the guarantee of a letter of credit to the extent say of (£5,000) five thousand pounds sterling, to be issued by J. & W. Seligman & Co., of New York, we propose to deposit with the Charlottesville National Bank business paper to the extent of $35,000. For such amounts of said letter of credit as we may use, we propose the bank shall discount of said paper at 9 per cent. a sufficient amount to cover the amount used by us, holding the balance as collateral security for same; the bank to receive the money under the letter of credit which is used in the discount aforesaid. It is further agreed that we will take the risk, as to any fluctuations in gold, so that the difference in rate of interest between that charged us and that paid by the bank shall not be less than at the rate of 2 per cent. per annum in favor of the bank, the bank having the benefit of any fluctuations which may increase their profit."

This proposition was accepted by the bank by the following resolution of its board: "Resolved, that the president and cashier be and they are hereby authorized, in accordance with the proposition submitted by B. C. Flanagan & Son to guarantee to Messrs. J. & W. Seligman & Co. drafts drawn under their letter of credit, in favor of B. C. Flanagan & Son, to the extent of £5,000 on the deposit with the bank of business paper by Flanagan & Son as collateral security to the extent of $35,000."

The plaintiffs aver that in consideration of this acceptance of Flanagan & Son's proposition by the bank, they gave to Flanagan & Son a letter of credit for £5,000, as follows: "No. 1023. New York, May 25, 1875. Messrs. Seligman Bros., London. Sirs: We herewith beg to open with you a credit in favor of Messrs. B. C. Flanagan & Son, of Charlottesville, Va., for £5,000, of which they will avail themselves either in their own drafts or the drafts of such parties as they may accredit with you at four months after sight. You will please honor said drafts to the above amount, advising us promptly of maturity. J. & W. Seligman & Co."

Flanagan & Son deposited the $35,000 business paper with the bank, and the bank gave its written guarantee to Messrs. J. & W. Seligman & Co., as follows: "In consid-

eration of one dollar, to us in hand paid, the receipt of which is hereby acknowledged, we guarantee to Messrs. J. & W. Seligman & Co. the prompt and punctual payment of all sums and amounts due them under their letter of credit No. 1023, for five thousand pounds sterling on the part of Messrs. Flanagan & Son, and we hereby hold ourselves liable for the prompt and complete payment of all amounts that may so become due to them, and for the exact fulfilment of all the conditions mentioned in the annexed receipt: 'New York, May 25, 1875. Bills receivable amounting to $35,089 16/100 have been deposited with the Charlottesville National Bank by B. C. Flanagan & Son as collateral security for the within-mentioned credit, in accordance with the resolution of the board of directors, adopted in full board on 14th May, 1875.'" Which guarantee and receipt are signed by the president and cashier of the bank. And the resolution further shows that Flanagan & Son gave plaintiffs the following receipt: "New York, May 25, '75. Gentlemen: We have received to-day your letter of credit for £5,000 on London in our favor, dated to-day, and in consideration thereof we hereby agree that whenever advised of a draft having been drawn under said credit we will receipt your draft, or reimburse you upon your notifying us of the date when due, for the amount of said bills, payable in New York, twenty-one days before the maturity of the bills in London, or their equivalent in cash. We will allow you 2 per cent. banker's commission on the amount of drafts made under the above credit, together with bill stamps, postage, etc., and deposit with you the following collateral, which we authorize you to dispose of at your discretion, in the event of our non-compliance with the above terms. We further authorize you to cancel this letter of credit at any time to the extent it shall not have been acted upon when notice of revocation is received by the user. B. C. Flanagan & Son."

Drafts were drawn against the letter of credit, in accordance with the agreement, which were ultimately paid by plaintiffs, Flanagan having failed to accept and pay the twenty-one day drafts spoken of in the receipt. The bank failed and was placed in the hands of a receiver by the comptroller of the treasury, and the plaintiffs allege that it is liable upon its above written guarantee for the amount of Flanagan & Son's draft remaining unpaid and held by them.

To this declaration there is a demurrer; all errors in pleading are waived, and the question presented is, whether, upon the facts above set forth, the plaintiffs are entitled to recover. The case is free from many difficulties that have arisen in like cases. It is not a contest against the corporation itself pleading a want of power to make a contract from which it has derived no benefit, but which caused loss to others,

such a defence having been justly held by many courts to be as odious as the plea of the statute of limitations on the part of an individual debtor; but it is a contest between creditors claiming the same fund, where each party has the just right to contest the claim of the other in every legal manner. Nor is there any question of notice to parties, upon which many decisions in the bank cases depend. Here the transaction is in writing chiefly, and stands between the original parties to-day as it did the day it was made. Under these circumstances we are to determine whether or not a national bank is authorized by the statute creating it to guarantee the paper of a customer for his accommodation; for this is the real transaction set forth in the declaration. We will admit for the sake of the argument what plaintiffs' counsel have urged at bar, that a bank may borrow money to aid its customers; but here the bank got no money; none of the money procured by the letter of credit was to go to it. All the bank had to expect was the profit it was to make from the discount it received from the collaterals placed in its hands to secure it from loss by reason of the pledge of its credit to plaintiffs. The Flanagans were to give their own drafts to take up those drawn against the letter. They agreed what commissions the plaintiffs were to charge. The bank had nothing to do with the transaction except to see in the event of the failure of the Flanagans that the plaintiffs were secure against loss. What a national bank is authorized to do is defined by the statute of which it is the creature. The section of the statute applicable here is 5136 of the Revised Statutes. By that section it is authorized to exercise all such powers as are incidental to banking, by discounting and negotiating promissory notes, bills of exchange, and other evidences of debt. But certainly there is no discounting of promissory notes set forth in the declaration.

The cause of action is the written guarantee of the bank. To discount a note is to deduct the interest in præsenti and pay over in money the face value of the note to the holder. Here the bank parted with no money. To negotiate a promissory note is either to buy or sell it, and so with a bill of exchange. Here the bank neither bought nor sold any bills of exchange. It agreed to guarantee Flanagan's purchase of them from plaintiffs. By the same section the bank is allowed to lend money upon personal security; but it must be money that it loans, not its credit. Upon the deposit of the collaterals with the defendant by Flanagan, it loaned its credit to him to be used with plaintiffs.

It is alleged, however, that the bank by reason of the powers granted to it incidental to banking, could enter into this contract. But the incidental powers given are not the incidental powers given generally to all

banking institutions; but only such as are incidental to banks allowed to do such things as are prescribed by the statute,—such acts as are incidental to discounting and negotiating promissory notes and bills of exchange, and the loan of money on personal security, and the other acts of banking mentioned in the statute. We cannot see how this transaction can be brought within the powers of the bank granted by statute, and the demurrer must be sustained.