BOWEN v. NEEDLES NAT. BANK (MURPHY, Intervener).

(Circuit Court, S. D. California. May 2, 1898.)

No. 652.

1. CHECKS—NONPRESENTMENT—EFFECT.
Default in presenting a check, as distinguished from a bill of exchange, is excused by absence of prejudice to the drawer.

2. SAME—DISTINGUISHMENT FROM BILL OF EXCHANGE — PARTICULAR INSTRUMENT.
An instrument drawn by the cashier of a national bank in California upon a national bank in New York, in the following form: "Pay to the order of ———, ——— dollars,"—held to be a check, not a bill of exchange.

3. NATIONAL BANK—POWERS—GUARANTY OF DEBT.
An agreement by a national bank, to guaranty the payment of a debt of a third party, solely for his benefit, is ultra vires.

4. GUARANTY—WHAT CONSTITUTES—PARTICULAR CASE.
A promise by a bank to pay any checks that may be drawn upon it by a certain person is not a certification of such checks, but a guaranty.

5. CHECKS—CERTIFICATION WITHOUT FUNDS—LIABILITY.
A bank certifying a check without funds is not liable except to a bona fide holder.

6. NATIONAL BANK—ACCOMMODATION INDORSEMENT.
Accommodation indorsements or acceptances by a national bank are ultra vires, and void in the hands of holders with notice.

7. SAME—ULTRA VIRES—ESTOPPEL TO RAISE DEFENSE.
A bank is not estopped to deny its authority to make an ultra vires promise, where it has not received the fruits of the transaction, and where the promisee had notice of the facts giving rise to the illegality.

8. ILLEGAL CONTRACTS—MEANS OF EXECUTION.
Negotiable instruments executed as a means of carrying out an illegal contract are void in the hands of holders with notice.

9. NATIONAL BANK—ULTRA VIRES CONTRACT.
The defendant, a national bank in California, agreed with the plaintiff in New York to pay any checks drawn upon it by one B. Upon the faith of this promise, plaintiff honored several such checks, which were paid in the following manner: Defendant made its cashier's checks upon the C. Nat. Bank, in New York, at which bank it had no funds, and sent them to plaintiff, at the same time sending the C. Nat. Bank drafts on B. to cover its checks. Later, certain of these cashier's checks proved worthless, the drafts not being collectible, and were not presented to the C. Nat. Bank; but no prejudice to defendant by reason of such nonpresentment was shown. Held, the promise of the defendant bank was ultra vires, and void as to the plaintiff, he being chargeable, under the circumstances, with notice of the facts giving rise to the illegality.

This was an action at law by Abner T. Bowen against the Needles National Bank to recover the amount of certain checks. For decisions on motions, see 76 Fed. 176, 79 Fed. 49.

Works & Lee, for plaintiff.

Gardiner, Harris & Rodman and Henry C. Dillon, for defendant.

WELLBORN, District Judge.   In this case there was waiver of jury, and trial by the court.   The action was originally brought against the Needles National Bank, May 8, 1895.   Some months prior thereto said bank had become insolvent, and was, by the comptroller of the currency, placed in the hands of a receiver, Daniel Murphy, who intervened in this action, August 22, 1896.   Plaintiff unites in his complaint four causes of action, each of the first three stated under three separate counts, so drawn as to meet the various legal aspects of the case.   The first cause of action is an instrument in writing, as follows:

"N. N. B.   The Needles National Bank.   No. 2,307.

"Duplicate $8,775.   Needles, California, Sept. 10, 1894.
"Unpaid.
"Pay to the order of A. T. Bowen and Co.   $8,775.00
eighty-seven hundred and seventy-five and no/$100$ dollars.
           "W. S. Greenlee, 4
                     7
              "Cashier. 3

"To Chase National Bank,
 "New York, N. Y."

Said instrument, termed in the complaint a "bill of exchange," is, accurately speaking, as shown later on, a check; and, since the distinction indicated is a material one, I shall hereafter, in alluding to said instrument, observe its appropriate designation.

The second and third causes of action are in all respects the same as the first, except that the checks therein mentioned were drawn, respectively, September 12, 1894, for $8,300, and September 17, 1894, for $5,364.

The fourth cause of action is thus stated in the complaint:

"That on the 25th day of April, 1894, the plaintiff having theretofore advanced moneys to one Isaac E. Blake upon checks drawn by said Blake upon the plaintiff as A. T. Bowen & Co., and not being willing to advance further sums without some guaranty from the defendant, the said defendant, on the said 25th day of April, 1894, in writing, promised and agreed with plaintiff that it would pay all checks signed by the said Blake and drawn upon the plaintiff as A. T. Bowen & Co.   That, acting upon the said written promise of the defendant, the plaintiff thereafter, upon checks drawn by the said Blake for the following sums, and upon the following dates, respectively, to wit, September 4, 1894, September 5, 1894, September 10, 1894, and September 11, 1894, for the sums of $8,750, $8,300, $5,300, and $3,500, respectively, advanced to the said Blake the said sums of money upon the dates mentioned, and thereupon presented to the defendant the said checks for said sums, and upon receipt by said bank of the said three first-named checks the defendant issued its three several drafts for the sums above mentioned, payable to the order of this plaintiff, upon the Chase National Bank of New York, and delivered the same to this plaintiff; but that at the time said drafts were drawn and delivered to the plaintiff, and ever since, there has been no money on deposit or in the hands of the said Chase National Bank out of which said drafts could be paid, and the same have become dishonored, and remain wholly due and unpaid.   That the said sums of money, respectively, not having been paid by and through said drafts drawn by the defendant, the plaintiff thereupon demanded payment of the defendant of said sums, including the said sum of $3,500, but the defendant has wholly failed and refused to pay said sums or either of them, or any part thereof, and the whole thereof is now wholly due and unpaid."

The defenses relied on, and stated in the order in which it will be convenient for me to consider them, are, substantially: First. A conspiracy between Blake and the plaintiff to defraud the defendant through certain false representations and practices, particularly set forth in the complaint in intervention. Second. That before the checks sued on were drawn it was agreed between plaintiff, defendant, and the said Blake that said checks were to be paid by counterdrafts on Blake in New York City, and not otherwise; and that the defendant was to be saved and kept free from harm by this arrangement. Third. That on September 12, 1894, said Blake gave the note of himself and wife to plaintiff for $37,100, and that plaintiff accepted said note in full payment and satisfaction of all the demands sued on. Fourth. That the checks mentioned in the first three causes of action, and the written promise mentioned in the fourth, were without consideration. Fifth. That said checks were never presented to the drawee for acceptance or payment. Sixth. That said written promise was, in effect, a guaranty of the payment of the debt of a third person, made solely for his benefit, and therefore ultra vires; or, if said promise be considered an original undertaking, still Blake, as was known to plaintiff, had no funds on deposit with the defendant to pay his drafts, and therefore said promise, viewed as an original undertaking, was made without authority, and is void; and that, since the checks mentioned in the first three causes of action were drawn in attempted execution of said promise, without funds, and solely for the benefit of Blake, they likewise are void. The intervener filed a cross complaint, but abandoned it at the trial. Defendant also filed a cross complaint, claiming balance of $69.45, and asks judgment on the same.

Some of the facts of the case are admitted; others are in dispute. As to the latter, the evidence is voluminous, and I shall not undertake to review it, but simply state my findings therefrom, together with the admissions of the pleadings. The material facts thus appearing are these: Defendant drew the checks sued on in settlement of drafts for corresponding amounts drawn by Blake on itself, and payable to the order of A. T. Bowen & Co., the name under which plaintiff conducted a banking business in the city of New York. Plaintiff, as he testifies, advanced to Blake the various amounts of money called for by said drafts on or about their respective dates, to wit, the 4th, 5th, and 10th of September. When Blake drew said drafts, he had no funds on deposit with the defendant for their payment. The checks sued on were not paid by the drawee, nor were they presented for payment. Defendant did not, at the time or subsequent to the dates of said checks, have funds with the Chase National Bank to meet them, but at the time of forwarding said checks to plaintiff also drew and forwarded to the Chase National Bank drafts for corresponding amounts on said Blake. From the promises of Blake and his previous compliances therewith defendant had reason to believe that said drafts on him would be paid, and that the Chase National Bank, thus provided with funds, would honor the checks issued to plaintiff. The defendant has suffered no loss or injury from the failure to present said checks for payment. The

checks sued on were drawn pursuant to a written promise of defendant, referred to in the fourth cause of action, and evidenced by the following telegrams and letters:

"Received at the Western Union Building, 195 Broadway, N. Y., April 25, 1894. Dated Needles, Calif., 25.

"To A. T. Bowen & Co., 71 Broadway, New York: We will pay checks signed Isaac E. Blake by W. L. Beardsley.

"Needles National Bank."

"The Needles National Bank, Needles, California, April 25th, 1894.

"A. T. Bowen & Co., New York City—Gentlemen: We hereby beg leave to confirm our telegram to you of even date, 'We will pay checks signed Isaac E. Blake by W. L. Beardsley,' signed 'Needles National Bank.'

"Yours, truly, W. S. Greenlee, Cashier."

"The Needles National Bank, Needles, Cal., August 22nd, 1894.

"A. T. Bowen & Co., New York City—Gentlemen: I am in receipt of telegraph communications from Chase National Bank that our draft No. 2,200 for $7,500, payable to the order of Bowen & Co., has been refused payment until advices received from us guarantying the amount received. I immediately guarantied the amount to be $7,500, and I trust I have put you to no great inconvenience. It is simply a clerical error, which happens to us all some time or other, and in future we will endeavor to be more careful. I have telegraphed you to please pardon our error, and that we wish you to still continue your friendly relations with Mr. Blake and Mr. Beardsley, and that we guaranty absolutely the payment of Mr. Blake's checks as heretofore. I am truly sorry the mistake has occurred, and can venture the assertion that it will not happen again. The Keystone Mine has just uncovered a large body of high-grade ore, and, if the vein continues as it is now for the next thirty days, it will make a big showing. Again asking your pardon, I remain, with best wishes,

"Very truly yours, W. S. Greenlee, Cashier."

Plaintiff's advances to Blake commenced in January, 1894, and continued down to September following. During this period, many checks, aggregating thousands of dollars, were drawn by Blake on the defendant, payable to the order of the plaintiff, and checks issued therefor by the defendant on the Chase National Bank. The means by which defendant supplied the Chase National Bank with funds to meet said bills of exchange were, as hereinbefore stated, drafts drawn by defendant, through said National Bank, on Blake. All of said checks and drafts down to and excepting those specifically mentioned in said complaint were duly honored and paid. The first communication between plaintiff and Greenlee, cashier of the defendant, probably about the time the first check was drawn, was a letter dated January 22, 1894, stating the inclosure, and that there would be no charge for remitting. On February 10, 1894, another check of $1,900 was forwarded by plaintiff to the defendant, with the added inquiry:

"Please give us what information you can relative to Mr. Isaac E. Blake's financial standing. Is he always prompt in meeting his financial obligations, and absolutely reliable in every way? Is he careful, capable, conservative, or the opposite?"

To this inquiry the bank, over the signature of its president, responded as follows:

"Replying to your kind letter of inquiry regarding Mr. I. E. Blake, I am pleased to state that he has been one of the foremost men of his city [Denver]

87 F.—28

for many years, and his reputation for credit and absolute reliability is unquestioned."

Then follows the statement of Blake's investments "in this vicinity," which were likely to prove a great fortune, etc. On the 4th of August, defendant's cashier, by letter, gives a renewed assurance of Blake's financial standing and credit, with a reference to the particular properties in which he was interested, and which promised large returns. On September 5th the plaintiff wrote to the bank as follows:

"Do the drafts drawn by Mr. Blake represent the amount of products of the Keystone Mine or the receipts of Nevada Southern Railroad, and are the amounts of money deposited with you to meet them before drafts are drawn, or are they drawn on you as they wish?"

The bank responds to this inquiry, September 12th, as follows:

"I can say this: That the money is deposited in New York to cover all checks drawn on this bank by Mr. Blake, and Mr. Blake's checks will be paid by this bank as heretofore."

On September 12, 1894, Blake executed to the plaintiff, in settlement of the advances theretofore made to Blake by plaintiff, the note of himself and Agnes N. Blake, as shown by the following agreement:

"New York, Sept. 12, 1894.

"Whereas, Isaac E. Blake and Agnes N. Blake have given their note dated Sept. 12th, 1894, for thirty-seven thousand one hundred dollars ($37,100.00), and Isaac E. Blake has given his note for one hundred seventy-seven and $^{52}/_{100}$ dollars ($177.52), being the amount of the following:

| | |
|---|---:|
| W. L. & M. E. Beardsley note (balance) | $ 296 73 |
| W. J. Mann note | 606 90 |
| Isaac E. Blake's draft Needles Nat. Bk. at 9/1/94 | 25 00 |
| Isaac E. Blake's draft Needles Nat. Bk. at 9/4/94 | 8,750 00 |
| Isaac E. Blake's draft Needles Nat. Bk. at 9/5/94 | 8,300 00 |
| Isaac E. Blake's draft Needles Nat. Bk. at 9/10/94 | 5,300 00 |
| Isaac E. Blake's draft Needles Nat. Bk. at 9/11/94 | 3,500 00 |
| I. E. Blake, two notes dated 5/15/94, $5,000.00 each | 10,195 00 |
| Overdraft on account | 303 89 |
| | $37,277 52 |

"It is understood and agreed that A. T. Bowen & Co. are to have the privilege of holding drafts that may be issued by the Needles National Bank (for drafts on said bank drawn by I. E. Blake) to retain all the security possible on said claims, but, when the amount of said notes are paid, then such drafts are to be surrendered to said Blake.

"Isaac E. Blake."

"N. Y., Sept. 12th, 1894.

"This certifies that Isaac E. Blake and Agnes N. Blake have abandoned and given up their legal residence in Colorado, and are now residents of New York City and state of New York. Isaac E. Blake."

If defendant is not liable on any of the causes of action set up in the complaint, then there is a balance of $69.45 due the defendant from the plaintiff.

The conclusions which I have reached as to the several defenses relied on are as follows:

1. A large amount of testimony has been introduced for the avowed purpose of showing collusion between the plaintiff and Blake to defraud the defendant; but the testimony, I think, is insufficient

for that purpose. Besides, so far as concerns the statement of plaintiff to the Bradstreet Company, touching the value of the stock of the Utah Nevada Company, and the values of the properties owned by said company, the defendant's witness Mr. Greenlee testified positively that that statement did not influence the defendant in the issuance of the checks sued on.

2. The evidence fails to show any agreement between plaintiff, defendant, and Blake that Blake's checks were to be paid by means of counterchecks on Blake in New York City, and defendant thus saved harmless.

3. The notes of Isaac E. Blake and Agnes N. Blake executed to plaintiff September 12, 1894, were not given in satisfaction of the alleged liabilities sued on. The agreement of that date, signed by Isaac E. Blake, expressly provides to the contrary, as follows:

"It is understood and agreed that A. T. Bowen & Co. are to have the privilege of holding drafts that may be issued by the Needles National Bank (for drafts on said bank drawn by I. E. Blake) to retain all the security possible on said claims, but, when the amount of said notes are paid, then such drafts are to be surrendered to said Blake."

4. The advances of money by plaintiff to Blake, while it is true the defendant received no part of the same, were sufficient consideration for the checks sued on, and also for the written promise, which is the basis of plaintiff's fourth cause of action. The law is too well settled to require any citation of authority that detriment to the promisee, as well as benefit to the promisor, is sufficient consideration to support a contract.

5. Whether or not said instruments ought to have been presented for payment depends, it seems to me, under the peculiar facts of this case, upon the question whether or not said instruments are to be classified as checks or bills of exchange. While, according to some authorities (1 Daniel, Neg. Inst. § 1567; Civ. Code Cal. § 3254), checks are a species of bills, yet, in this opinion, for the purpose of convenient and clear statement only, I shall, as do some of the text writers (1 Morse, Banks, § 380), treat the check as an independent and distinct instrument from the bill of exchange. While, perhaps, an occasional case may be found holding otherwise, the great weight of authority is to the effect that want of prejudice or injury to the drawer of a bill of exchange never excuses default in making presentment. 2 Daniel, Neg. Inst. p. 207, § 1170. The rule in California as to what does excuse such default is as follows:

"Presentment of a bill of exchange for acceptance or payment, and notice of its dishonor, are excused as to the drawer, if he forbids the drawee to accept, or the acceptor to pay the bill, or if, at the time of drawing, he had no reason to believe that the drawee would accept or pay the same." Civ. Code Cal. § 3220.

"Among the circumstances under which the drawer has a right to expect that his bill will be honored, and consequently to require strict presentment and notice, may be named: * * * Where a third party has promised to provide the drawee with funds." 2 Daniel, Neg. Inst. § 1076.

See, also, Id. §§ 1074–1078. The last paragraph of the latter section is as follows:

"But the bona fide expectation of the drawer, based upon his relations with the drawee, and the provision he has made, or intends to make, and does

make, are, it seems to us, the circumstances to be regarded. If he has no funds in the drawee's hands when he draws, and yet provides them before presentment, he should have notice. If he had funds when he drew, but withdrew them before presentment, he forfeits the right to it. If the drawer has any arrangement by which, at the time the bill is presented, he has a right to expect it to be honored, we should say he should have demand and notice; for it would be presumed that such arrangement was contemplated when he drew."

Lafitte v. Slatter, 6 Bing. 623, s. c. 31 Rev. Reports, 510, is strongly in point. In that case it was held that:

"The drawer of a dishonored bill is entitled to notice of dishonor, although he knows the bill will not be paid by the acceptor: provided he has reason to expect it will be paid by another person, or has a remedy over against that person."

See, also, Tied. Com. Paper, p. 615, § 355, note 1.

The rule enunciated in the above quotations, and the reasons therefor, have been clearly stated as follows:

"It is conceded on both sides that there were no funds in the hands of the drawee. The fact of drawing without funds, in the absence of other proof to explain it, is a fraud, for the bill is negotiated under the faith that the drawer has or will place effects in the hands of the drawee to meet the bill; and if he had no effects in the hands of the drawer, and knew that none would be placed there, and that the drawee would not meet the bill, the whole transaction is deemed fraudulent on the part of the drawer. Another, but subordinate, reason is given for this exception,—that the drawer cannot, in such case, be in any way injured for want of notice of nonpayment. But it is the fraud in drawing and delivering such a bill upon which the exception substantially rests, for bankruptcy or notorious insolvency of the drawee, or proof that in fact no injury resulted from want of notice, will not excuse the holder from giving the drawer notice. Notice, therefore, under this exception, is to be dispensed with in those cases where the drawer had no reason to expect, when he drew the bill, that it would be paid. Thus, in the case of Rucker v. Hiller, 16 East, 43, it was laid down that the drawer is entitled to notice if he have reasonable ground to expect the bill will be paid, although he have no assets in the acceptor's hands. So, in the case of Lafitte v. Slatter, 6 Bing. 623, in which the defendant drew a bill on one Tebbs, under the expectation that a third person, not a party to the bill, who owed him, would provide funds for its payment, but neglected to do so, it was held that the defendant was entitled to notice of nonpayment. Indeed, the rule is too well settled, both by English and American cases, to admit of question, that if the drawer has reasonable grounds to expect that the drawee will receive, through the transactions of the drawer, or from some one else, funds to meet the bill, although the drawer had no assets in the hands of the drawee, the drawer is, notwithstanding, entitled to notice of nonpayment. 2 Smith, Lead. Cas. (Hare & W. Notes) 55." Miser v. Trovinger's Ex'rs, 7 Ohio St. 286.

See, also, French's Ex'x v. Bank, 4 Cranch, 141, Dickins v. Beal, 10 Pet. 572, and McRae v. Rhodes, 22 Ark. 315.

With reference to checks, however, the rule is quite different, and is thus declared in California:

"A check is subject to all the provisions of this Code concerning bills of exchange, except that: (1) The drawer and indorsers are exonerated by delay in presentment, only to the extent of the injury which they suffer thereby. * * *" Civ. Code Cal. § 3255.

This rule as to checks is elsewhere stated as follows:

"But there is this difference between bills and checks as to the consequences of negligence or delay in demand and notice: The failure to make a prompt presentment on the day of maturity, and to give promptly the notice of dis-

l. ..r, in the case of bills, will discharge the **drawer** and indorsers, even though they have not suffered in any wise by the delay or neglect; but in the case of checks the drawer is not discharged by such neglect or delay, if he has not suffered any injury in consequence of it." Tied. Com. Paper, p. 723, § 442.

See, also, 2 Daniel, Neg. Inst. §§ 1587, 1588.

Thus it will be seen that the vital question on this branch of the case is whether or not the instruments sued on in the first three causes of action are checks; for, if checks, failure to present would be excused, because no injury or loss resulted therefrom. If, however, they were not checks, but bills of exchange, default in presentment would not be excused; for, although no injury or loss resulted from the failure to present, yet when the instruments were drawn the defendant had reason to believe that they would be paid. In California a check is defined thus:

"A check is a bill of exchange drawn upon a bank or banker, or a person described as such upon the face thereof, and payable on demand, without interest." Civ. Code Cal. § 3254.

The definition given by one of the text writers already mentioned is as follows:

"A check may be defined to be a draft or order having essentially the characteristics of a bill of exchange, and differing from the bill (1) in being drawn on a bank or banker, (2) apparently and presumptively against a deposit of funds, and (3) payable on demand without grace. The attempt to define checks by comparing them with bills of exchange is frequently criticised as furnishing an incomplete definition. But the definition given in the text is sufficient to point out the essential characteristics of a check, without requiring a second discussion of those principles which are common to both bills and checks; while the points of differentiation between the two kinds of paper are more clearly and prominently set forth." Tied. Com. Paper, § 430.

Another definition is as follows:

"A check is (1) a draft or order (2) upon a bank or banking house, (3) purporting to be drawn upon a deposit of funds (4) for the payment, at all events, of a certain sum of money (5) to a certain person therein named, or to him or his order, or to bearer, and (6) payable instantly on demand: * * * Any instrument fulfilling the above description may, we think, be safely denominated a bank check; and the definition given is sustained by many authorities, though not in the language of the text. Writers upon negotiable instruments have differed in their definitions of this species of commercial paper, some falling short of giving all its distinguishing qualities, and some ascribing to it qualities which it is not absolutely necessary that it should possess. And there is none which can be safely relied on as a guide in answering the question, is this paper a check?" 2 Daniel, Neg. Inst. § 1566.

The same author, elaborating this definition, says further:

"Sixthly, a check is payable instantly on demand. This is, as we conceive, the touchstone by which a check is tested. Usually no time of payment is expressed upon its face, but all commercial instruments in which no time of payment is expressed are understood to be, and impliedly are, payable on demand; and, when so payable by implication or in express terms, they are payable instantly, without the allowance of grace, which pertains to those payable on a particular day. The whole theory and use of a check points to its immediate payability as its distinguishing feature, and its name imports it. A person deposits money with his bank or banker, where it is subject at any time to his order. By an order he appropriates so much of it to another person, and the bank or banker, in consideration of its temporary

use of the money, agrees to pay it in whole or in parcels, to the depositor's order, when demanded. But he does not agree to contract to pay at a future day by acceptance, and the depositor cannot require it." 2 Daniel, Neg. Inst. § 1572.

The two chief characteristics of checks are found in the instruments here sued on. They are drawn, and purport to be drawn, on a bank; and, in the next place, are payable instantly, on demand. They do not specify on their face the times of payment; but when this is the case the instrument is presumed to be payable on demand. Tied. Com. Paper, § 24; 1 Daniel, Neg. Inst. § 599; 2 Daniel, Neg. Inst. § 1572. The fact that they are payable in another state than the one in which they are drawn does not change their character as checks. 1 Morse, Banks, § 375. A draft drawn in one state on a bank in another is nevertheless a check, and, in point of fact, checks are very much used in the United States in transmitting money from one state to another. 2 Daniel, Neg. Inst. § 1567. My conclusion is that the instruments sued on possess the characteristics of, and are, checks, and that, inasmuch as the defendant was in no way injured or prejudiced by plaintiff's failure to present said checks, presentment is excused. See, also, Bull v. Bank, 123 U. S. 105; 8 Sup. Ct. 62; Marbourg v. Brinkman, 23 Mo. App. 513; Story, Bills, §§ 472, 473; 1 Daniel, Neg. Inst. §§ 469, 472, notes.

6. The remaining questions to be determined are whether or not the written promise mentioned in the fourth cause of action was unauthorized, and, if unauthorized, whether or not the defendant is estopped from asserting such want of authority. If the defendant was without authority to make said promise, and is not estopped from pleading such want of authority, then it follows not only that there can be no recovery on the fourth cause of action, but also that there can be no recovery on the first three causes of action, because the checks respectively mentioned in said three causes of action were simply means whereby the defendant, without funds having been provided by Blake, attempted to execute the promise set up in the fourth cause of action. It is well settled that a national bank has no authority to guaranty the payment of a debt of a third person, solely for his benefit; and a promise of that sort, whether made by the cashier or board of directors, is ultra vires. Seligman v. Bank, 21 Fed. Cas. 1036; Bank v. Pirie, 27 C. C. A. 171, 82 Fed. 799. The latter is doubtless the latest case to be found on the subject, having been decided September 13, 1897. In that case the court says:

"The act of congress under which the bank was organized confers no authority upon national banks to guaranty the payment of debts contracted by third parties; and acts of that nature, whether performed by the cashier or by his own motion or by direction of the board of directors, are necessarily ultra vires. A national bank may indorse or guaranty the payment of commercial paper which it holds when it rediscounts or disposes of the same in the ordinary course of business. Such power, it seems, a national bank may exercise as incident to the express authority conferred on such banks by the national banking act to discount and negotiate promissory notes, drafts, bills of exchange, and other evidences of debt (People's Bank v. National Bank, 101 U. S. 181, 183; U. S. Nat. Bank v. First Nat. Bank, 49 U. S. App. 67, 24 C. C. A. 597, and 79 Fed. 296); but it has never been supposed that the board

of directors of a national bank can bind it by contracts of suretyship or guaranty which are made for the sole benefit and advantage of others. The national banking act confers no such authority in express terms or by fair implication, and the exercise of such power by such corporation would be detrimental to the interests of depositors, stockholders, and the public generally. Norton v. Bank, 61 N. H. 589; State Bank v. Newton Nat. Bank, 32 U. S. App. 52, 58, 14 C. C. A. 64, and 66 Fed. 691, 694; Bank v. Smith, 40 U. S. App. 690, 23 C. C. A. 80, and 77 Fed. 129. In contemplation of law, therefore, the vendors knew, when they sold the goods in controversy, that the guaranty in question was of no avail as a security, even though they supposed that it had been executed with the sanction of the board of directors. It results from this view that, if we were able to admit that the presentation of the guaranty to Carson, Pirie, Scott & Co. carried with it an implied representation that it had been executed by direction of the board of directors, and that the bank was in a sound financial condition, yet we would not be able to concede that either of these representations was material, inasmuch as the plaintiffs below must be presumed to have known that the guaranty imposed no legal obligation upon the guarantor." Bank v. Pirie, 27 C. C. A. 171, 82 Fed. 801.

See, also, Bank v. Smith, 23 C. C. A. 80, 77 Fed. 129, and Flannagan v. Bank, 56 Fed. 959.

It is true that in the last-mentioned case Judge Ross, who decided it, says, in the course of his opinion, that if the promise of the defendant had been a promise to pay a check drawn on itself, and plaintiffs had parted with their money on the strength of the promise, defendant would have been held liable; citing Garrettson v. Bank, 47 Fed. 867. This, however, was merely a passing observation, outside of the facts, and, moreover, the case cited in its support—Garrettson v. Bank—did not involve any question as to the powers of a national bank. It should be further noted that the supposed promise which Judge Ross said would have been enforced was a promise to pay a stated check for a given amount, and there were no circumstances to put the promisee upon notice; that the promise was merely matter of accommodation to the drawer. The same is true of the Garrettson Case.

In Farmers' & Mechanics' Bank v. Butchers' & Drovers' Bank, 16 N. Y. 128,—one of the cases cited by plaintiff,—the court says:

"The defendant is a banking corporation, organized under the general banking law of this state; and it is, I think, a sound position that such a corporation exceeds its powers when it becomes the mere surety for another upon a contract in which it has no interest, or lends its credit in any form for the exclusive benefit of other parties. Such a contract is ultra vires, and cannot be enforced against the bank by any person cognizant of the facts."

Plaintiff, however, contends that the written promise mentioned in the fourth cause of action, being a contract to pay checks drawn on itself, was, in legal effect, the certification of said checks, and an original undertaking, binding upon the defendant,—citing a number of cases; among others, Merchants' Bank v. State Bank, 10 Wall. 604, 648, and Farmers' & Mechanics' Bank v. Butchers' & Drovers' Bank, supra, wherein the power of a bank to certify checks is upheld. While the rule enunciated in plaintiff's citations, that a bank has power to certify checks, is now well established,—indeed, so far as national banks are concerned, has been legislatively declared (Rev. St. U. S. § 5208; Merchants' Nat. Bank v. First Nat. Bank, 7 W. Va. 544),—it does not apply here. The promise of the

defendant in the case at bar differs as widely in substance as it does in form from the certification of a check. In Merchants' Bank v. State Bank, supra, the court, referring to the certification of a check, says:

"It implies that the check is drawn upon sufficient funds in the hands of the drawer, that they have been set apart for its satisfaction, and that they shall be so applied whenever the check is presented for payment."

No such implications were possible here, for the reason that defendant's promise did not relate to existing checks for fixed sums, but to future dealings, without limit as to time or amount. It was a broad promise to pay all advances of money which plaintiff might thereafter make to Blake on the latter's checks, i. e. checks drawn by Blake on the defendant. The allegation of the complaint is:

"That on the 25th day of April, 1894, the plaintiff, having theretofore advanced moneys to one Isaac E. Blake upon checks drawn by said Blake upon the plaintiff as A. T. Bowen & Co., and not being willing to advance further sums without some guaranty from the defendant, the said defendant, on the said 25th day of April, 1894, in writing, promised and agreed with plaintiff that it would pay all checks signed by the said Blake and drawn upon the plaintiff as A. T. Bowen & Co."

The statement in this quotation that the checks therein mentioned were to be drawn on plaintiff, I think, was inadvertently made by the pleader, since the evidence shows, and such is plaintiff's contention in his brief, that the checks which defendant promised to pay were checks payable to plaintiff as A. T. Bowen & Co., and drawn, not on A. T. Bowen & Co., but on the defendant; and, if plaintiff were entitled to recover on such a promise, the court would direct or permit the complaint to be amended so as to conform to the evidence. Treating the promise of defendant as a promise to pay checks drawn on itself, it will still be observed that plaintiff counts upon that promise as a guaranty, and, moreover, the defendant, in its letter to plaintiff of August 22, 1894, says: "* * * We guaranty absolutely the payment of Mr. Blake's checks as heretofore." Now, men do not guaranty their own debts, nor do they employ that word to designate an original undertaking. "A guaranty is a promise to answer for the debt, default or miscarriage of another person." Civ. Code Cal. § 2787. When, therefore, we find that the defendant, in a letter written to the plaintiff before the transactions sued on took place, refers to its promise as a guaranty, and that the plaintiff, when he comes to sue the defendant upon the promise, adopts, in his pleading, the same designation, it is fair to conclude that both the plaintiff and defendant considered said promise, not an original undertaking, but precisely what they called it, a guaranty; that is, a promise to answer for the debt of another person,—Blake. In determining whether a promise is a guaranty or an original undertaking, the language made use of, the situation and surroundings of the parties, and every other fact and circumstance bearing upon the question, should be taken into consideration (Brandt, Sur. § 64); and where a promise is, in substance, a promise to pay the debt of another, no matter what its form, it is a guaranty, not an original undertaking (Id. § 60 et seq.). If, however, as contended by plain-

tiff, defendant's promise to pay Blake's checks was, in legal effect, a certification of the checks covered by said promise, and therefore an original undertaking, still the defendant would not be liable thereon, for the reason that Blake did not have on deposit with defendant funds to pay said checks, and plaintiff, as I shall show later on, was at least constructively notified of that fact. That a bank certifying a check without funds is not liable thereon to any one except a bona fide holder has been decided in numerous cases. Cook v. Bank, 52 N. Y. 96; Claflin v. Bank, 25 N. Y. 293; 1 Morse, Banks (3d Ed.) § 413, subd. "C." It is true that the act of congress of March 3, 1869, above referred to as section 5208 of the Revised Statutes of the United States, after providing that "it shall be unlawful for any officer, clerk, or agent of any national banking association to certify any check drawn upon the association unless the person or company drawing the check has on deposit with the association, at the time such check is certified, an amount of money equal to the amount specified in such check," further provides that "any check so certified by duly authorized officers shall be a good and valid obligation against the association." This latter provision, however, I am satisfied, does not apply where the check is in the hands of the original payee, who knows, or is chargeable with constructive notice, that the check was drawn in violation of law. In Farmers' & Mechanics' Bank v. Butchers' & Drovers' Bank, 16 N. Y. 132, one of the cases cited by plaintiff, the court says:

"Hence it cannot be pretended that a person who should take and pay value for a check, with knowledge that the bank had no funds of the drawer to meet it, would acquire any valid claim against the bank, although such check was certified by the cashier himself."

From the circumstances of the case at bar, I am satisfied that plaintiff is chargeable with constructive notice of the fact indicated. He knew that the checks which he received from the defendant were not always promptly paid by the Chase National Bank, and that the deposits with the Chase National Bank to meet the checks were sometimes made after such checks were drawn. Mr. Mills, cashier of the Chase National Bank, in his deposition testified that: "Messrs. A. T. Bowen & Co.'s representative called upon me from time to time, and made inquiry in regard to certain deposits received from the Needles National Bank, and he informed me that they had discounted or purchased drafts drawn by Isaac E. Blake on the Needles National Bank, and that the Needles National Bank remitted their checks on the Chase National Bank in payment; and that, as certain checks were not good, he informed me that they received Nevada Southern bonds as collateral to the indebtedness." He further says: "The drafts on Isaac E. Blake, which were sent us drawn by the Needles National Bank, were entered for collection by us, and occasionally there was a delay in their payment; and Messrs. A. T. Bowen & Company had checks for similar amounts drawn on us, which we declined from time to time, for the reason that the drafts on Isaac E. Blake were not promptly paid." Referring to these transactions and conversations, the witness further testifies, "At one time A. T. Bowen & Co.'s representative called, I should say, daily." Answer-

ing the question whether these things occurred before the 12th of September, witness says, "Yes; refusals were made by us, I think, in August." These matters, thus testified to by Mr. Mills, together with the general course of dealing between the plaintiff and Blake and the defendant, were, I think, sufficient to put the plaintiff on inquiry as to whether or not Blake was drawing against funds actually on deposit with the defendant. However this may be, plaintiff, by his own letter of September 5th, hereinbefore copied, shows himself chargeable with constructive notice that Blake had no funds on deposit with the defendant. In that letter he inquires: "Do the drafts drawn by Mr. Blake represent the amounts of products of the Keystone Mine, or the receipts of Nevada Southern Railroad, and are the amounts of money deposited with you to meet them before drafts are drawn, or are they drawn on you as they wish?" This letter, it will be observed, was written before plaintiff had advanced any of the money involved in this suit, except that covered by the check mentioned in the first cause of action, and only one day after that advancement was made. Of course, there must have been circumstances within the plaintiff's knowledge to put him upon this inquiry, otherwise it would not have been made; and the rule is well settled that "every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact." Civ. Code Cal. § 19. While the language above quoted is that of the legislature of California, yet it may be accepted, I think, as the general rule on the subject of constructive notice. To plaintiff's letter of inquiry defendant replies, September 12th, as follows:

"I can say this: That the money is deposited in New York to cover all checks drawn on this bank by Mr. Blake, and Mr. Blake's checks will be paid by this bank as heretofore."

This reply was but a confirmation of the suspicion which plaintiff obviously entertained, and clearly informed him that Blake had no funds on deposit with the defendant to meet his drafts, but that provision for their payment was made by deposits in New York. Had this reply of the defendant been received by the plaintiff before he advanced money on Blake's checks, plaintiff would have had actual notice that the checks were drawn without funds to meet them. As the reply was not received, however, until after said advances, it cannot be said, as to said checks, that the facts communicated in said reply were within plaintiff's actual knowledge; but, as I have already stated, his own letter of September 5th shows that he did have constructive notice of said facts. This interpretation of said letter is confirmed by plaintiff's attorneys in their brief, on page 9, lines 18 to 22, inclusive, where they say:

"It is evident that the plaintiff had for some reason become uneasy, and desired to get all the security he could. He had written to the bank on the 5th for definite information on the question whether Blake was drawing on funds actually in the bank, and other particulars, but had received no reply."

So that, under the facts of this case, even if the defendant had certified Blake's checks, it would not have been liable thereon.

Plaintiff further insists that the undertaking of the defendant, being a promise to pay checks drawn on itself, was an original undertaking, and that defendant had authority to bind itself in that way. This contention is closely allied to the one last considered, and what I have there said in reference to the lack of power in a bank to certify checks where there are no funds to pay them is equally applicable here. To the authorities which I have already cited may be added the following extract:

"It may be stated, however, with entire confidence, that the cashier of a bank has no power to involve its funds by indorsing or accepting for the accommodation of third parties. As already seen, the treasurer of a corporation has no such power; nor can the directors themselves involve the funds of the stockholders, and what may ultimately become a trust fund for creditors, by thus obliging strangers. But as cashiers have a general power to indorse negotiable paper, such indorsements would be good against the bank in favor of an innocent purchaser of the paper before maturity." 4 Thomp. Corp. § 4800.

See, also, Bank v. Wells, 79 N. Y. 498.

Plaintiff further contends that, inasmuch as he advanced moneys on Blake's drafts, the defendant is estopped from denying its authority to make the promise set up in the fourth cause of action. This contention, in my opinion, is vulnerable. Without reviewing the numerous cases cited by plaintiff in his brief, it is sufficient to note, as a material distinction between most of them and the case at bar, that here the defendant's promise was given solely for Blake's accommodation; and, furthermore,—which is a more conclusive answer to plaintiff's contention,—he is not in the position of a bona fide holder without notice. He knew that he was dealing with a national bank, which had no power to bind itself by a guaranty, or by a promise to pay checks drawn on it, in the absence of deposits to meet such checks; and he had constructive notice that Blake had no funds on deposit with the defendant, and, therefore, that the defendant's promise to pay Blake's drafts, whether considered as a guaranty or an original undertaking, was in violation of law. The cases cited by plaintiff in support of the alleged estoppel, namely, People's Bank v. National Bank, 101 U. S. 183, and American Nat. Bank v. National Wall-Paper Co., 23 C. C. A. 33, 77 Fed. 85, are inapplicable. In each of these two cases the decision of the court rested upon the fact that the bank against whom the estoppel was asserted had received and appropriated the fruits of the transaction in question. Besides, in the former of said two cases, the bank had authority to make the guaranty there sued on, since it was made in transferring notes of which the bank was the holder, and, as stated by the court in Commercial Nat. Bank v. Pirie, supra, "a national bank may indorse or guaranty the payment of commercial paper which it holds, when it rediscounts or disposes of the same in the ordinary course of business." From all the facts of the case, I am of opinion that the real nature of defendant's undertaking, mentioned in the fourth cause of action, although in form a promise to pay drafts drawn on itself, was a guaranty, and so recognized by both parties. If, however, said undertaking be considered an original promise, still it was in direct violation of law, because Blake

did not have on deposit with the defendant funds to meet his checks, and of that fact plaintiff had constructive notice. For the reasons above indicated, there can be no recovery on the fourth cause of action. Nor can there be any recovery on the first three causes of action, for the reason that the checks therein mentioned were drawn without funds, solely for the benefit of Blake, and were simply the means whereby the defendant attempted to execute the unauthorized and illegal promise mentioned in the fourth cause of action. The defendant is entitled to recover on its cross complaint. Judgment will be entered conformable to this opinion.