NAKDIMEN *v*. FIRST NATIONAL BANK.

Opinion delivered May 21, 1928.

*James B. McDonough, Jr.,* and *James B. McDonough,* for appellant.

*Daily & Woods,* for appellee.

Wood, J.   This is an action instituted in the circuit court of Sebastian County by the First National Bank and the Merchants' National Bank of Fort Smith, Arkansas, against I. H. Nakdimen.   The plaintiffs alleged, in substance, that they are national banks; that Nakdimen is the president of the City National Bank of the city of Fort Smith; that, on or about December 21, 1927, the officers of the Arkansas Valley Bank, another bank at Fort Smith, reported to the plaintiffs and to the City National Bank that the Arkansas Valley Bank would close its doors unless some arrangements could be made to pay its depositors in full, and offered to the plaintiffs and to the City National Bank all of the assets of the Arkansas Valley Bank and, in addition, the sum of $70,000, provided the three banks mentioned would pay the depositors and the valid debts of the Arkansas Valley Bank; that the City National Bank declined to enter into such an agreement, but I. H. Nakdimen agreed that he would personally pay the plaintiffs the sum of $5,000 if plaintiffs would accept the offer of the Arkansas Valley Bank; that the plaintiffs accepted the offer of Nakdimen, and, in consideration of his promise, agreed to pay all the depositors of the Arkansas Valley Bank in full and to assume and pay all other valid debts, if any, of the Arkansas Valley Bank; that the Arkansas Valley Bank had conveyed to the plaintiffs all its assets, and the directors of the Arkansas Valley Bank had paid to the plaintiffs the sum of $70,000; that the plaintiffs had performed each and every one of the covenants of their contract with Nakdimen, and that he had wholly failed to pay the plaintiffs the sum of $5,000.   The plaintiffs prayed judgment for such sum, with interest due thereon at the date of the judgment.

The defendant, in his answer, admitted the organization and business status of plaintiffs, as set up in the complaint, and admitted that he was the president of the City National Bank at Fort Smith, Arkansas.   He denied specifically all the other material allegations of the com-

plaint, and further denied that there was any consideration passing from the plaintiffs to the defendant, or to any one else, whereby the defendant obligated himself to pay the plaintiffs, or any one else, any sum of money. The defendant further denied that any covenant was made by the plaintiffs to the defendant in any contract, and denied that any contract was made in writing, or otherwise, whereby the defendant undertook to become liable for the debts, default, or other obligation of either of the plaintiffs, or to the Arkansas Valley Bank or its officers or directors, and denied that there was any consideration whatever for the alleged agreement between the plaintiffs and the defendant.

The issues of fact were submitted to a jury, and the testimony was substantially as follows:

W. J. Echols testified that he had lived in Fort Smith forty-six years, and had been president of the Merchants' National Bank about twenty years. He was called by Hugh Branson, president of the Arkansas Valley Bank, on December 21, 1927, to attend a meeting of the directors of that bank. There were present at that meeting the directors of that bank and John C. Gardner, A. M. Sicard, I. H. Nakdimen, and the witness. The president of the Arkansas Valley Bank announced that, on account of the recent defalcation of one of its officers in the sum of about $25,000, and whose bond was $15,000, and on top of another misfortune that the Valley Bank had had, they had decided to close the Valley Bank, unless some arrangement could be made for taking it over. The directors of the Valley Bank offered $70,000. Mr. Nakdimen said that he would gladly take over the bank if he had room, but that his bank was so small that he could not do it, and suggested that one or the other of the plaintiffs take it over. The feasibility of the three banks taking it over and paying the depositors and the debts in proportion to their respective resources, was discussed. Mr. Nakdimen stated that he would not do that. Witness asked Mr. Sicard if he

would take it over for $10,000. He stated that he would not, but would give witness $10,000 to take it over. Nakdimen said he would give $5,000 if witness would take it over, and if witness' loss was more than that he would give $1,000 more, and give his personal check for it. Witness asked Nakdimen if he would hold his proposition open in case he took the bank over, and Nakdimen stated that he would. Several of the officers of the plaintiffs went over the paper of the Valley Bank, and the losses were apparently so great—so much paper that they did not know anything about—they could not form a very definite conclusion as to what the losses might be; they might be $50,000 or over $50,000—they could not tell.

A meeting of the citizens was called that night in the room of the Arkansas Valley Trust Company. Mr. Nakdimen was present at that meeting. Witness further testified as follows: "I stated that the Arkansas Valley Bank would close the next morning, unless arrangements were made to take it over and pay the depositors and other just debts. I stated that they would turn over to the Merchants' National Bank all their assets; that the directors would pay personally $70,000; that Mr. Nakdimen had agreed to donate $5,000; that the First National and the Merchants' National Banks had agreed to lose $25,000, including the $5,000 that Mr. Nakdimen would give, before the citizens would be called upon to give anything; that if the citizens, subject to these payments, would underwrite a bond for $40,000, guaranteeing us against loss to that extent in excess of the assets of the bank and the $70,000 paid by the directors and the $25,000 the banks would lose, we would take it over and pay the depositors of the bank. It was a splendid meeting, and saved a very serious situation. I made the statement twice, because there were about 25 or 30 that came in at first and probably 15 later. Mr. Nakdimen was present when I made the statement both times, and when the bond was being written up I turned to him and said, 'You

agreed to give $5,000, and in addition to that you agreed to pay another $1,000 if the losses were greater than we expected,' and he subsequently signed for $1,000. Witness further testified that Nakdimen did not deny that he had agreed to pay $5,000 to the plaintiffs under the conditions as above stated. The bond for $40,000 was signed by some that night and by others the next day.

The Arkansas Valley Bank turned over to the First National and Merchants' National Banks all the assets of the Arkansas Valley Bank under the following agreement:

"This agreement this day entered into by and between Arkansas Valley Bank of Fort Smith, party of the first part, and Merchants' National Bank of Fort Smith and First National Bank of Fort Smith, parties of the second part:

"Arkansas Valley Bank, for valuable consideration, receipt of which is hereby acknowledged, hereby sells, assigns, transfers, sets over and delivers unto the First National Bank of Fort Smith and the Merchants' National Bank of Fort Smith all of its assets, both real and personal, and wheresoever located, and it hereby agrees to execute such other and formal deeds, transfers, assignments and indorsements as may be necessary. In consideration of said sale and transfer, and in consideration of other valuable considerations and agreements moving to them from individuals, said Merchants' National Bank of Fort Smith and First National Bank of Fort Smith hereby agree with the said Arkansas Valley Bank to pay all valid debts of said Arkansas Valley Bank.

"In testimony whereof Arkansas Valley Bank has, by order of its board of directors, caused these presents to be executed by its president, attested by its cashier, and corporate seal; and First National Bank of Fort Smith has, by order of its board of directors, caused these presents to be executed by its president; and Merchants' National Bank of Fort Smith has, by order of

its board of directors, caused these presents to be executed by its president, all in triplicate, this 22d day of December, 1926.

(Signed) "Arkansas Valley Bank,
"By Hugh Branson, its president.
"Attest: G. H. Sexton, cashier.
"First National Bank,
"By A. N. Sicard, its president.
"Merchants' National Bank,
"By W. J. Echols, its president."
(Seal of Arkansas Valley Bank).

There was also executed the following instrument:

"Whereas the Arkansas Valley Bank has, concurrently with the execution of this agreement, transferred all of its assets of every kind, shape, form, manner and description, to the First National Bank and Merchants' National Bank of Fort Smith, and has placed John C. Gardner as liquidating agent for said First National Bank and said Merchants' National Bank in possession of said assets; and whereas, concurrently with the execution of this agreement, the directors of said Arkansas Valley Bank have paid to said First National Bank and said Merchants' National Bank the sum of $70,000; and whereas the First National Bank and the Merchants' National Bank, in consideration of said transfer of said assets, said payment of $70,000, and the execution by us and the delivery to them of this agreement, have agreed to pay in full all the valid debts of said Arkansas Valley Bank (including deposits).

"Now therefore each of us severally, but not one for the other, agree that, in case the net proceeds received and collected by said two banks from the assets so transferred, plus said $70,000, plus an additional $25,000, the risk of which said two banks assume, fails to pay said valid debts (including depositors) of the Arkansas Valley Bank, then that we will severally, but not one for the other, pay the said First National Bank and Merchants' National Bank that proportion of the amount

set opposite our respective signatures that said sum so set opposite our respective signatures bears to the total amount paid out by said two banks on debts of said Arkansas Valley Bank, in excess of the following: the net proceeds received and collected by said two banks from the assets so transferred, plus $70,000, plus $25,000; provided, that in no event shall any one of us be liable for any amount in excess of the amount by us severally set opposite our respective signatures.

"Dated this 22d day of December, 1926."

Then follow the signatures and the amounts set opposite their respective names. The last name signed is that of I. H. Nakdimen, and set opposite his name is the notation, "$1,000, and no more."

The bond was in two parts, both being worded precisely the same, the amount of obligation in the first part being $42,500 and in the second part $9,500. Concurrent with the execution of the bond, the Merchants' National Bank and the First National Bank signed the following statement:

"We agree that the signers of the obligation, copy of which is hereto attached, will not be required to pay to us in the aggregate in excess of $40,000."

The witness continued his testimony, saying that the additional signatures over $40,000 were obtained to minimize the loss of any one who signed the bond. The next day witness called Mr. Nakdimen over the 'phone and asked him to pay the $5,000, which he declined to do. Hence this action against him.

Witness was asked the following: "Q. Did Mr. Nakdimen make a statement in the first meeting that he would pay in the event of a loss? A. He said he would pay $5,000, whether we lost or gained, and he said that he would pay $1,000 more if we lost more than we expected. Q. How did he say he would pay the $5,000, in cash, or how? A. He said that he would give us his personal check."

On cross-examination the witness stated, among other things, that, about sixty days before the Valley

Bank was taken over by the plaintiffs, witness' bank had been requested by the president of the Valley Bank to take over the assets of that bank and liquidate them. Witness made an examination of that bank's assets. Its deposits at that time were approximately three-fourths of a million. After examining a list of the notes and other assets, which he had under consideration for probably a week, witness notified the president of the Valley Bank that he did not care to liquidate that bank. It was a private matter, and witness did not discuss it with any one. Just after the meeting on December 22, 1926, there appeared on December 23, 1926, in the Southwest American, a daily newspaper published in Fort Smith, a statement which reads in part as follows:

"W. J. Echols, president of the Merchants' National Bank, in a statement in which A. N. Sicard, head of the First National Bank, concurred, declared Wednesday night: 'There has been another serious defalcation in the Arkansas Valley Bank, in the clerical department. This, coming on the heels of the previous defalcation, caused the directors to realize that they could not hope to continue the bank with the full confidence of the public. Realizing that a run would be made on the Arkansas Valley Bank, its directors called the bankers of Fort Smith into consultation with them as to the means of having the depositors paid in full, if possible. In the event this could not be done, it was felt that it would be necessary to close the bank at once, in order that no preference might be shown depositors who might call first for their money. After several days of consultation with the First and Merchants' National Banks it was arranged to pay the depositors in full. John C. Gardner was chosen to represent the First and Merchants' National Banks and take charge of the Arkansas Valley Bank and pay the depositors as promptly as their accounts could be balanced. The City National Bank contributed a fund of $5,000 in order to minimize to this extent any possible loss that the First and Merchants' National Banks might

sustain in taking over the assets of the Arkansas Valley Bank and in paying its depositors. The directors of the Arkansas Valley Bank contributed a liberal fund in cash to make it possible for the First and Merchants' Banks' to liquidate its affairs. The leading business men of Fort Smith have also agreed to hold the First and Merchants' Banks harmless to the extent of $40,000 in the event they sustain any loss in excess of $25,000.' ''

Witness stated that the statement was erroneous in that it stated that the City National Bank had contributed $5,000; that it had not contributed $5,000; that Mr. Nakdimen agreed to. The statement in the newspaper was not written out and signed by witness. Witness was just talking to a reporter. After the controversy arose, witness wrote out a corrected statement and had it published.

Mr. A. N. Sicard testified for the plaintiffs. We will not set out his testimony in detail, as it corroborates substantially the testimony of the witness Echols. In regard to what Nakdimen said on the night that he and Echols and witness were consulting about the liquidation of the Valley Bank, witness testified as follows: ''Nakdimen stated that if we would take the Arkansas Valley Bank over and pay the depositors, he would pay $5,000, and would give his personal check. He stated that he wanted his liability fixed. The amount was not fixed. Of course, the $5,000 was supposed to cover any loss that might be sustained.''

Witness was asked the following question: ''If you sustained any loss, he would give it—that is right? A. Yes sir.''

Speaking of the meeting of witness, Echols, and the citizens held in the Arkansas Valley Trust Company's building on December 21, 1926, witness further testified as follows: ''We felt that we would be willing to stand a loss of $25,000, including the $5,000 we expected to get from Mr. Nakdimen, if the citizens would raise a bond of $40,000 to protect us in that amount, guaranteeing us

against any further loss, and at that meeting that bond was signed up, and Mr. Gardner was selected as liquidating agent and placed in charge of the bank the next morning, and there was placed to his credit by the First and Merchants' National Banks the sum of $750,000 to pay off the depositors of the Arkansas Valley Bank.''

On cross-examination the witness stated that the Arkansas Valley Bank at that time had about $750,000 in deposits. The liquidating agent balanced the accounts of the depositors and gave them a check on witness' bank or the Merchants' Bank for the money, which they deposited wherever they pleased.

During the examination of this witness he identified a letter dated December 28, 1926, addressed to the First National and the Merchants' National Banks, which the plaintiffs offered in evidence. The attorney for the defendant objected to its introduction, whereupon one of the attorneys for the plaintiffs stated: ''The purpose of it is to show that the two banks were not to profit by the conveyance made to them, but were assuming a loss, if there were any, and not to profit by the arrangement made, and to show how it is to be held.'' The court would not permit the letter to be introduced in evidence, but allowed the witness, over the objection of appellant, to testify that the agreement between the Valley Bank and the First and Merchants' National Banks, with reference to the conveyance of the assets of the Valley Bank, was as follows: ''After the debts of the bank were paid, any remaining assets were to be turned back to the directors, first, who had advanced $70,000, and, should there be any left over, it was to go to the stockholders of the Arkansas Valley Bank.''

Six other witnesses testified for the plaintiffs. Their testimony corroborates substantially the testimony of Echols concerning the statement made by Echols at the meeting of the citizens held at the building of the Arkansas Valley Trust Company, to the effect that he stated openly at that meeting to the persons there assembled,

at which meeting I. H. Nakdimen was present, that, to prevent the closing of the Arkansas Valley Bank the next morning, the Merchants' and First National Banks had agreed that they would lose $25,000, including the $5,000 that Nakdimen would give, before the citizens would be called upon to give anything; that the arrangement was that the Merchants' and First National Banks were to give $10,000 each and Mr. Nakdimen would give $5,000 to have the Merchants' and First National Banks take over the assets and pay the depositors and all valid debts of the Valley Bank; that Echols, in making a statement, turned to Nakdimen and asked him to join with them in taking over the Valley Bank, and that he declined to do so, stating that he wanted to know what his actual loss would be. One of the witnesses, who went the next morning to obtain the signature of Nakdimen to the bond, testified that he told Nakdimen that Echols had told him that Nakdimen would give $5,000, win or lose; that in reply Nakdimen said, "I did, and would have, but when they called the public in to take care of their losses, I didn't feel obligated to do so." Witness then said to Nakdimen, "You should have spoken up," whereupon Nakdimen replied, "I did not say anything—they did all the talking. It was not my place to talk—it was their meeting."

Another witness testified that Echols stated that the two banks were to lose $10,000 each before the bond was called on for anything. Echols stated that Nakdimen proposed to pay $5,000 to the other banks to save the failure and for taking the Valley Bank over; that the two other banks were to stand a loss of $10,000 each if there was that much, before the bond would come in, but that Echols did not say that they gave anything. Witness did not hear all that was said at the meeting.

Another witness stated that Echols said at the meeting that any loss, after the bond had been exhausted, would be borne by the Merchants' and First National Banks. Another one of the witnesses stated that Echols

stated that Nakdimen had agreed to pay $5,000 if the First National Bank would take over the assets of the bank, and he further stated that the First National and Merchants' National Banks were willing to lose $10,000 each, and not over that, because, in his opinion, the loss would be more. This witness further stated that, shortly after the above transaction, he had a conversation with Nakdimen, in a Pullman coming from St. Louis, in which conversation Nakdimen stated that he had not agreed to pay the $5,000 unless there was a real loss in the transaction. Witness asked Nakdimen why he did not correct Echols at the meeting, and Nakdimen replied that he didn't wish to break up the meeting.

Another witness testified that Echols stated at the meeting that the City National Bank did not want to join with the other two banks in the liquidation of the Arkansas Valley Bank. This witness was asked whether Echols said anything about what Nakdimen personally had agreed to do, and the witness answered, "Well, as I remember it, the First National and the Merchants' National Banks were to pay $10,000 each and Mr. Nakdimen $5,000." Witness did not know whether this proposition was conditioned on loss or not.

Fagan Bourland testified as a witness for the defendant. He was present at the meeting of the citizens at the building of the Arkansas Valley Trust Company. He did not remember who made the statement, but was of the opinion that it was Mr. Echols, who stated that the stockholders were to put up $70,000 and the three banks were to put up $25,000. The two larger banks, the First National and the Merchants' National, were to put up $10,000 each and the City National $5,000. That this $25,000 from the banks was to be used to indemnify the depositors after the $70,000 subscribed by the stockholders was exhausted. Witness was under the impression at the meeting that the three banks together were to take over the assets and pay the depositors of the Arkansas Valley Bank, and stand a loss.

I. H. Nakdimen, the defendant, testified that he was president of the City National Bank; that he was called by Branson, president of the Arkansas Valley Bank, to a meeting at which the affairs of the Arkansas Valley Bank were discussed. He was shown a piece of paper purporting to be a confession of the bookkeeper. After reading it, he remarked that $30,000 would not break the bank. He was told that the bookkeeper had a bond of $25,000 and had $4,000 in the bank, and witness stated that that was enought to pay the $30,000. Witness said to Echols, "Why don't you buy it?" and Echols said to him, "Why don't you buy it?" Witness finally said to Echols that he would give $3,000 towards the loss. When Echols asked witness if witness would buy it, he replied, "No." Then Sicard asked Echols, "Why don't you buy it?" Echols asked Sicard, "Would you give $20,000?" Sicard replied, "No, I will give $10,000," whereupon witness said, "I will give $5,000." Sicard asked Echols if he would be included in the $25,000, and Echols said, "No." Witness offered to give $20,000 for the deposits, but his offer was ignored. Witness declined to take any of the notes or paper. Finally, after further discussion and conversation, witness said, "I will give $5,000," meaning that much toward the loss. Witness' offer was rejected. Witness further testified that he was present at the later meeting, Wednesday night, at which Echols made a statement. Witness did not like the statement, but did not contradict Echols, because witness was afraid that he would get in a row and that the Arkansas Valley Bank would be closed. The statement was made that the City National Bank would give $5,000, and witness stated that the bank would give $5,000 and that he would give personally an additional $1,000. Witness did not refuse to pay the $5,000 only until they showed witness a loss. At the meeting Echols and Sicard were representing their respective banks and witness was representing the City National Bank. Witness stated at the meeting that he was willing to give $5,000, not

for himself, but for the bank. He denied that he had told Echols that he would pay $5,000 personally, whether there was a loss or not.

On cross-examination witness stated that at the first meeting, speaking for the City National Bank, he refused to go in with the First and Merchants' National Banks to pay off the depositors of the Valley Bank. On redirect examination witness stated that he didn't know who had prepared the contracts and bond, but he signed the bond the next day, or several days thereafter.

At the close of the testimony the plaintiffs asked the court to instruct the jury as follows:

"1. In this case you are called upon to decide one single issue, which is, did I. H. Nakdimen agree to pay $5,000 to the Merchants' National Bank and the First National Bank, in consideration of these two banks agreeing to pay in full the deposits and other valid debts of the Arkansas Valley Bank? If you find from a preponderance of the evidence that I. H. Nakdimen made such an agreement, then your verdict will be for the plaintiff for $5,000, with interest on such amount at six per cent. from the date that demand was made upon him for payment. If you find that I. H. Nakdimen made no such agreement, your verdict will be for the defendant.

"2. The written agreement of the First National Bank and Merchants' Bank to pay the valid debts of the Arkansas Valley Bank was sufficient consideration to support a promise of I. H. Nakdimen to pay $5,000, if you find that I. H. Nakdimen made such promise."

The defendant objected generally to the giving of each of the above prayers for instructions, and excepted to the ruling of the court granting same. No specific objection or exception was saved.

The court granted the following prayers for instruction at the instance of the defendant:

"1. If the defendant, I. H. Nakdimen, was not representing himself personally in any negotiations relating to the taking over of the Arkansas Valley Bank,

and if his negotiations were made for and on behalf of the City National Bank, the jury will find a verdict for the defendant.''

''6. If the plaintiffs and the defendant entered into a contract whereby the defendant agreed to pay to the plaintiffs the sum of $5,000, and if the agreement was that said sum was to be paid the plaintiffs only in the event of loss to the plaintiffs by taking over the Arkansas Valley Bank, then and in that event the jury will find for the defendant.

''6½. In order to make a contract binding there must be a consideration. To be a consideration, there must be a benefit to the party promising or a loss or detriment to the party to whom the promise is made.''

The court refused to grant the following prayers for instruction presented by the defendant:

''1. The court instructs the jury to find the issues for the defendant.''

''3. If the jury find that the defendant, I. H. Nakdimen, was not representing the City National Bank in said negotiations, and was representing himself, then and in that event the jury will consider the instructions given below in order to ascertain whether the defendant is liable to the plaintiffs or not.

''4. If the plaintiffs were contemplating the taking over of the Arkansas Valley Bank, and if the representatives of the plaintiffs, having authority so to do, entered into negotiations with I. H. Nakdimen, and if the plaintiffs and the defendant entered into a contract whereby the defendant agreed to pay the plaintiffs the sum of $5,000, and if said contract was not in writing, the jury will find for the defendant.

''5. In order to make a contract binding, there must be a consideration. To be a consideration, there must be a benefit to the party promising or a loss or detriment to the party to whom the promise is made. Benefit as thus employed means that the promisor has, in return for his promise, acquired some legal right to

which he would not otherwise have been entitled, and the word 'detriment' means that the promisee has, in return for the promise, forborne some legal right which he otherwise would have been entitled to exercise. Unless there was a consideration existing in this alleged contract as thus defined, the jury will find for the defendant.''

''7. If the plaintiffs and the defendant entered into an agreement such as that set forth in the complaint, and if in that agreement the defendant undertook and agreed with plaintiffs to pay to them the sum of $5,000, whether they suffered a loss or not, and if the consideration for that agreement on the part of the defendant was a benefit, if there was one, resulting to the defendant, the same as to all other citizens in Fort Smith, arising from the taking over of the Arkansas Valley Bank and thus avoiding the failure of that bank, the court instructs the jury that such benefit, even if it existed to the defendant, is not a benefit within the meaning of the law which may support a contract, and in that event the jury will find for the defendant.

''8. A benefit such as will support a contract must be either a benefit to the defendant or a detriment to the plaintiffs. The fact, if it be a fact, that plaintiffs took over the Arkansas Valley Bank, is not alone sufficient to be a detriment within the meaning of the law, and if the plaintiffs forbore no legal right or gave up no legal right, then the said taking over would not be such a detriment as will support a contract.''

The defendant duly excepted to the ruling of the court in refusing to grant each of the above prayers for instructions.

The jury returned a verdict in favor of the plaintiffs in the sum of $5,000, with interest from the date of demand. The court rendered judgment in favor of the plaintiffs against the defendant in the sum of $5,250, from which is this appeal.

1.   The appellant contends that the complaint does not state facts sufficient to constitute a cause of action. There was no separate demurrer by the appellant to the allegations of the complaint, but in his answer the appellant denied that there were "any covenants of any kind between the plaintiffs herein and this defendant." Learned counsel for the appellant contend that there were no facts alleged in the complaint showing a return promise made by the plaintiffs to the defendant. Therefore they insist that appellant has not waived the objection that the complaint does not state facts sufficient to constitute a cause of action, although there was no separate demurrer and no demurrer embodied in the appellant's answer to the allegations of the complaint.

We agree with counsel that, if the allegations of the complaint do not state facts sufficient to constitute a cause of action, the appellant has not waived such objection by failing to file a separate demurrer or by failing to demur to the complaint in his answer.   Under § 1189 of C. & M. Digest one of the grounds of demurrer is "that the complaint does not state facts sufficient to constitute a cause of action;" and § 1192, C. & M. Digest, provides that "when any of the matters enumerated in § 1189 do not appear upon the face of the complaint, the objection may be taken by answer.   If no such objection is taken, either by demurrer or answer, the defendant shall be deemed to have waived same, except only * * * the objection that the complaint does not state facts sufficient to constitute a cause of action."   As we have stated above, the appellant in his answer denied that there were any covenants between the plaintiff herein and this defendant.   Therefore, if counsel be correct in their contention that the complaint does not allege any facts sufficient to show a return promise made by the appellees to the appellant in consideration of appellant's promise to pay them $5,000, it is certain that the appellant has not waived the defense of failure upon the part of the appellees to state facts constituting a cause of action in their com-

plaint. Because he has specifically raised that issue in his answer, and, even if he had not so raised it, such issue is not waived under the express provisions of the statute *supra*.

But, after a careful consideration of the allegations of the complaint, we cannot concur in the view of counsel for the appellant, that the allegations of the complaint do not state facts sufficient to show that the appellees made a return promise to the appellant in consideration of his promise to pay them $5,000. Recurring to the allegations of the complaint, without again setting them out in detail, it will be observed that, after setting forth that the appellant offered and agreed that he would pay the appellees $5,000 if appellees would agree to pay the depositors and other valid debts of the Arkansas Valley Bank, the complaint further sets forth that the ''First National Bank and the Merchants' National Bank accepted the offer so made by the said I. H. Nakdimen, * * * and the First National Bank and the Merchants' National Bank, for and in consideration of the promise and agreement made by the said I. H. Nakdimen, *agreed to pay all of the depositors of said Arkansas Valley Bank in full and agreed to assume and pay all other valid debts, if any, of said Arkansas Valley Bank;* that the First National Bank and the Merchants' National Bank have performed each and every one of the covenants of their contract made with the said I. H. Nakdimen on their part to be performed.''

It occurs to us that the above allegations not only allege facts sufficient to show a return promise on the part of the appellees to do certain acts in consideration of appellant's promise, but the allegations are sufficient to show that the appellees had fulfilled the promise made by them to the appellant. Assuming, as they do, that the allegations of the complaint do not state facts sufficient to show a return promise on the part of the appellees for the offer or promise on the part of appellant to pay to them the sum of $5,000 upon certain conditions as a con-

sideration of appellant's promise or offer, counsel for appellant cite us to a number of our cases. Under the doctrine of these cases they insist there was no mutuality of obligation and no consideration to support the promise of appellant upon which this action was founded. See *Eustis* v. *Meytrott,* 100 Ark. 510, 140 S. W. 590; *Elmore* v. *Snow,* 102 Ark. 592, 146 S. W. 476; *Feldman* v. *Fox,* 112 Ark. 223, 164 S. W. 766; *Baucum* v. *Waters,* 125 Ark. 305, 188 S. W. 802. But, since we have concluded that the complaint does allege facts sufficient to show a return promise on the part of the appellees for the promise made by the appellant and as a consideration for his promise, it follows that the above authorities have no application.

Counsel urge that the case of *Eustis* v. *Meytrott, supra,* is controlling on the question under consideration. That case was determined on general demurrer by the defendant to the plaintiff's complaint. The complaint in that case set forth at great length the promise of the defendant upon which the action was instituted and the circumstances under which the promise was made, and the acts performed by the plaintiff, superinduced, as he alleged, by the promise of the defendant. But it is not alleged in the complaint *that the plaintiff accepted the offer of the defendant; nor is it alleged that the plaintiff, in consideration of the promise and agreement of the defendant, agreed in return to do anything in consideration for such promise on the part of the defendant.* In the case at bar, the complaint, after setting forth the promise of the defendant, alleged that "the plaintiff accepted the offer so made by the said I. H. Nakdimen, and, * * * in consideration of the promise and agreement made by the said I. H. Nakdimen, agreed to pay all the depositors of the said Arkansas Valley Bank in full, and agreed to assume and pay all other valid debts," etc.

The case of *Baucum* v. *Waters, supra,* was determined on the facts, which showed no mutuality of obligation. Likewise the other cases mentioned above are

wholly differentiated from the case at bar on the facts, and we need not review them.

We are dealing now with the sufficiency of the allegations of the complaint to constitute a cause of action. The appellees set out in their complaint the promise of appellant, stating the facts constituting such promise, and alleged that such promise was made upon the condition or consideration that appellees would perform certain acts, and set forth what those certain acts were, and further alleged that the appellees accepted the promise of appellants and agreed on their part to perform those acts, and had performed the same. Appellees thus stated facts showing a contract between the appellees and the appellant sufficient, if proved, and if violated by appellant, to constitute a cause of action in favor of appellees. To be sure, the condition set forth in the complaint to be performed by the appellees as the consideration for the promise on the part of appellant, is a condition precedent which must be performed by the appellees before their cause of action against the appellant accrued. In their complaint the appellees set up the condition, and alleged that "they have performed each and every one of the covenants of their contract made with the said I. H. Nakdimen on their part to be performed." This was sufficient. It was not essential that they set forth the specific acts which constitute a performance of the condition precedent to recovery on their part. These, where performance was controverted, were matters of proof. Section 1227, C. & M. Digest; *Kirshman* v. *Tuffli Bros.,* 92 Ark. 111, 122 S. W. 239.

2. One of the grounds urged for reversal is "that the agreement of the plaintiff banks to lose $10,000 each was *ultra vires,* illegal, and absolutely void, and cannot be a consideration to support any promise of I. H. Nakdimen." Section 5136, ch. 1, p. 993, Revised Statutes of the U. S., pertaining to the organization and powers of national banks, among other things provides;

"It (a national bank) shall have power: 7. To exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of this title."

It is thoroughly settled that a national bank, under the above statute, has no authority, either in express terms or by implication, to lend its credit to a third person solely for his benefit, by becoming a surety, indorser, or guarantor for him. Such acts are *ultra vires* and void, and no rights grow out of them that will bind such banks by estoppel. *Merchants' Bank of Valdosta* v. *Baird,* 160 Fed. 642; *Farmers' & Miners' Bank* v. *Bluefield National Bank,* 11 Fed. (2d.) 83; *Commercial National Bank* v. *Pierrie,* 82 Fed. 799; *Bowen* v. *Needles National Bank,* 87 Fed. 430; *Id.* 94 Fed. 925; *Seligman* v. *Charlottesville National Bank,* 21 Federal Cases, No. 12642, p. 1036. Counsel for appellant cite and rely upon the above doctrine announced in these cases. See also *First National Bank of Leslie* v. *Stokes,* 134 Ark. 368, 373, 203 S. W. 1026, and cases there cited. But the facts of this record, as shown by the testimony and as the jury might have found, and did find, them, make the doctrine as above announced wholly inapplicable.

It would unduly extend this opinion to discuss the facts in detail, which have been already sufficiently set forth. To sustain their contention that the contract of the appellees with the Valley Bank, which was the consideration for, and out of which arose, the contract between the appellees and the appellant, was *ultra vires*, counsel for appellant assume and argue that the uncontradicted testimony shows that the appellees agreed unequivocally to lose the sum of $25,000 in taking over the assets and

paying the depositors and valid debts of the Arkansas Valley Bank before Nakdimen would, or could, be called on by them to comply with his promise to pay them $5,000. It is unquestionably true that, when the appellees and the appellant responded to the S. O. S. call of the president of the Valley Bank and met in consultation concerning its affairs, all contemplated that there might be a loss to the bank or banks taking over the assets of the Valley Bank and discharging its obligations in a sum reaching from fifty thousand to one hundred and fifty thousand dollars. But no one knew certainly what the amount of the loss, if any, would be. To prevent the far-reaching, disastrous and embarrassing consequences which the failure of a large banking institution neces-sarily causes in the financial and business life of any com-munity where the same is located, the appellees and the appellant expressed a willingness, each of them, to incur a loss, if it involved a loss, to take over the assets of the distressed bank and discharge its obligations. The appellees and the appellant did not know absolutely that there would be a loss, or, if a loss, the amount of such loss, but each was willing to contribute something to the one which might assume the risk by taking over the assets of the Valley Bank and paying its depositors and valid debts. These were the general circumstances which superinduced the contract entered into between the appellant and the appellees and the contract between the appellees and the Valley Bank. The appellees did not agree with the appellant that they would certainly lose $25,000 before they called on him to pay the $5,000 which he offered and promised to pay in the event they took over the Valley Bank and furnished the necessary funds to discharge its obligations. They agreed with the appel-lant that they would take over the assets of the Valley Bank and pay into such bank the money necessary to discharge its obligations and assume the risk of what-ever loss, if any, might be involved in the transaction. The testimony, in its final analysis, justified the jury in

finding that the appellant, in consideration that the appellees would put up their money and assume such risk, and thus prevent the threatened disaster to the whole business community, promised that he would pay to them the sum of $5,000. In the circumstances the promise of each to the others was a sufficient consideration, when acted upon by any one of them, to bind the others.

The provisions of the written contract between the appellees and the Valley Bank and the bond do not reveal any *ultra vires* act on the part of the appellees. On the contrary, we are convinced that the provisions of these instruments and the oral testimony adduced on the issues involved show that the contract between the appellees and the Valley Bank was not in violation of the act of Congress *supra,* but was one which the appellees were fully authorized to make in the exercise of the ordinary powers of a banking corporation under the Federal statute.

The doctrine applicable to the facts of this record is announced in the case of *Schofield* v. *National Bank,* 97 Fed. 282, and expressed in syl. No. 3, as follows:

"A contract by a national bank to assume and pay the liabilities of another bank in consideration of the transfer to it by the other bank of its office furniture and lease and its cash and cash assets, and the further assignment to a trustee for its benefit of bills receivable and securities, is not *ultra vires,* but is within its powers conferred by statute to conduct a general banking business." See also *George* v. *Wallace,* 135 Fed. 286; *Wyman* v. *Wallace,* 201 U. S. 230, 26 S. Ct. 495.

3. What we have already stated shows that the jury were justified in finding that there was a consideration for the contract and a performance thereof on the part of the appellees, inasmuch as the testimony showed that the appellees had performed their part of the contract by paying the money to the Valley Bank necessary to pay its depositors and valid debts. The appellees thus

discharged their promise to the appellant, which furnished the consideration moving from the appellees to the appellant, and which bound the appellant to perform his promise to the appellees. See *Nothwang* v. *Harrison*, 126 Ark. 552, 191 S. W. 2.

4.   We have considered the objections to the rulings of the court in granting and refusing prayers for instructions and in the admission and exclusion of testimony. We do not find any reversible error in these rulings.   The issues of fact were submitted under instructions at the instance of the appellees as well as the appellant, which were free from errors prejudicial to the appellant.

Instruction No. 1, given at the instance of the appellees, was erroneous because it directed the jury to return a verdict for the plaintiffs, if they found that the defendant agreed to pay the plaintiffs the sum of $5,000 without reference to whether plaintiffs had performed the contract on their part.   But this error was not prejudicial, for the reason that the undisputed evidence proved that plaintiffs, appellees, had performed the contract on their part.   The court correctly defined and declared what was necessary to constitute a consideration, and correctly submitted to the jury the issue as to whether the contract contemplated that there should be proved a loss by appellees before they were entitled to recover. The court ruled correctly in refusing appellant's prayers for instructions on his plea of the statute of frauds, because the testimony did not justify the submission of such issue.   The undisputed facts proved an original undertaking by appellant to pay appellees $5,000.   It was not a collateral agreement on his part to pay the debts of another.

There was testimony to sustain the verdict.   On the whole case, we conclude that the issues have been fairly tried and that the judgment is correct.   It is therefore affirmed.